UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
CANON U.S.A., INC,

                        Plaintiff,                        **REPORT AND**
                                                        **RECOMMENDATION**
          -against-                           CV 15-6015 (JMA)(AYS)

F&E TRADING LLC, et al.,

                        Defendants.
----------------------------------------------------------------X
**ANNE Y. SHIELDS, United States Magistrate Judge:**

       As noted in a prior opinion of this Court, with which familiarity is assumed, Plaintiff commenced this case to enforce its trademark rights in the Canon name. See Report and Recommendation dated June 6, 2023, Docket Entry herein ("DE") [42]; see generally Second Amended Complaint. DE [36]. Defendants are alleged to be engaged in the sale of Canon products that, while manufactured by Plaintiff, are not intended for sale in the United States. Defendants' marketing of such goods is alleged to violate Federal trademark and State unfair competition laws. See id.  Such goods are referred to herein as "gray market", "gray goods" or "Canon gray goods".

       The District Court has referred four motions in limine to this Court for Report and Recommendation. All motions are addressed to the admissibility of expert testimony. See Order dated 11/01/2022.  This Court held hearings on the motions on June 5 and 6, 2023. In a Report and Recommendation dated June 6, 2023, this Court recommended that Plaintiff's expert John Lamb be allowed to testify, and that the testimony of Defendants' expert Robert Frank be precluded. DE [142]. On June 6, 2023 this Court heard the testimony of the parties' proffered damages experts. Post-hearing memoranda of law were submitted on July 14, 2023. Upon consideration of the testimony at the July 6, 2023 hearing, the parties' submissions on the

pending motions and for the reasons that follow, the Court recommends that the remaining referred motions be granted in part and denied in part.

<u>BACKGROUND</u>

I.    <u>Procedural Posture and the Current Motions</u>

This case is trial ready. Presently before this Court are the final referred motions <u>in limine</u>, which are addressed to the admissibility of expert testimony on damages. Such damages, if any, will be in the form of profits reaped by Defendants from their sales of Canon gray goods. The pending motions are made pursuant to Rule 702 of the Federal Rules of Evidence and the standards articulated in <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), and its progeny.

Plaintiff's proposed damages expert is Susan Miano ("Miano"). Defendants' is Elliot Fishman ("Fishman"). According to Miano, Defendants' profits from sales of Canon gray goods during the relevant time period are in excess of $4 million. In contravention of Miano's opinion, Fishman seeks to testify that Defendants earned no profits (and indeed, suffered losses) in connection with their sale of such goods. Plaintiff argues that Defendants' expert testimony does not pass muster under <u>Daubert</u>. Defendants oppose Plaintiff's motion and cross-move, arguing that Plaintiff's expert testimony fails the <u>Daubert</u> test for admissibility. The Court turns first to discuss the expert testimony offered at the July 6, 2023 hearing.

II.    <u>The Hearing</u>

A.    <u>Canon's Expert: Susan Miano</u>

Susan Miano was retained by Canon to estimate profits reaped by Defendants from their sales of Canon gray goods. Transcript of Hearing dated June 6, 2023 (hereinafter "Tr.") at 3:18-20. Her expert report (the "Miano Report") appears as DE [139-18] and was marked as Exhibit 9

at the June 6, 2023 hearing.[1] Miano summed up her expert opinion as follows. She states, within a reasonable degree of professional certainty, that the economic damages suffered by Canon in the form of profits generated from Defendants' sales of gray market goods during the period 2013 through 2019 (referred to as the "Damages Period") were, exclusive of interest, $4.85 million dollars. Tr. 12:11. Miano calculated pre-judgment interest due to Plaintiff as of the date of her report at approximately $1.9 million. DE [139-18] at 33. While Miano testified as to her belief that Defendants continued to market gray goods between 2020 and 2021, her firm was not provided information regarding this time period. She therefore made no calculation of Plaintiff's damages for this period of time.

Miano has a Bachelor of Science degree in accounting and is a Certified Public Accountant. She is accredited by the American Institute of Certified Public Accountants (the "AICPA") in the areas of Business Valuation and Financial Forensics. See DE [139-18]. At the time of her engagement and as of the date of her report Miano was a partner at the firm of Friedman, LLP ("Friedman"). At the time of her testimony, Miano was a partner at Marcum LLP. Tr. 3:25. She explained that her present association with Marcum is a result of her prior firm's merger with Marcum. She was unaware that Marcum presently counts Canon as a client. She does not work on Canon matters at Marcum, and the Court holds that her present association with that firm does not discredit her position as an independent expert witness who may be

---

[1]    Miano's expert report is signed by both Miano, a then-partner at the firm of Friedman, LLP, and by Greg Kohr, a principal at that firm. Only Miano testified at the Daubert hearing. For ease of reference, the Court refers to her report as the Miano Report; rather than the "Friedman" report. It is of no moment that Kohr, who also signed on to the expert report, did not testify at the hearing. Any such testimony would have been cumulative.

allowed to testify.[2]  Prior to her association with Friedman, Miano was an Assistant Vice President and Internal Audit Supervisor with Bank Leumi and a Senior Auditor for Arthur Andersen. Miano's extensive professional presentations, seminars and publications are listed in her Statement of Qualifications, which is annexed as Exhibit C to the Miano Report. DE [139-18] at 22-26. Miano is licensed in both New York and New Jersey. Tr. 4:5. She serves as a special fiscal appointed by courts and frequently lectures to the bench and bar on tax litigation, support, valuation and damages. Id. at 4:7-12. Miano has served as an expert in cases involving claims of trademark infringement approximately twelve times. Id. at 4:17.

In connection with her engagement here Miano reviewed the pleadings, discovery and a document referred to in this case as the "F&E Model." Tr. 4:23-24. The F&E Model, as discussed below, was created by Defendants in support of their claim that Plaintiff suffered no damages as a consequence of Defendants' sale of Canon gray goods. Miano also reviewed a "gray sales" Excel schedule, the financial statements of Defendants for the years 2013 through 2019, and the depositions of Mr. Houllou and Mr. Raphaeli, both of whom are associated with the Defendants. Tr. 4:24-5:2.

The F&E Model was marked as Exhibit 8 at the hearing, Tr. 7:2-5, and is attached as Exhibit D-2 to the Miano Report. DE [139-18] at 31. It was prepared by Mr. Raphaeli and shows Defendants' Canon gray market sales for the years 2013 through 2019. It reflects the purchase price of gray goods and other expenses that Defendants contend are associated with those goods. It also reflects the price that Defendants received upon the sale of the goods. Tr. 5:9-13. The

---

[2]    The Court expresses no opinion as to any ruling that the District Court may make at trial with respect to questions that may be posed to Miano regarding her present position. It notes only that Miano was not associated with Marcum in any way when she was retained by Canon and prepared her expert report. As stated, this Court chooses to give no weight to that association in connection with the present motion.

F&E Model reflects mostly losses associated with Defendants' sales of Canon gray goods. Throughout her testimony Miano expressed frustration with Defendants' failure to supply her with detailed underlying accounting records. E.g. Tr. 5:13-6:3; 9:1-17; 22:13-16. According to Miano, the absence of such records hampered her ability to verify Defendants' numbers and to arrive at precise calculations. Nonetheless, she was able to arrive at her opinion, detailed below, with the documents provided.

The losses reflected in the F&E Model surprised Miano in view of the fact that Defendants had taken large profit distributions during the time period that the F&E Model showed losses. See Tr. 6:1-6; 8:4-7. Miano explained that to reach the loss conclusions set forth in the F&E Model, Defendants attributed an overly broad category of expenses to the sale of gray goods. Tr. 8:8-15. According to Miano, the only expenses that should have been considered when considering profits are those with a specific nexus to the sales of Canon gray goods. Tr. 8:15-16.

Miano testified that the F&E Model improperly attributes a simple pro rata percentage of all of Defendants' business expenses to sales of gray goods when determining profits. Thus, for example, the F&E Model attributes the fixed expense of rent to the sale of Canon gray goods when determining profits - even though such expenses are borne with respect to all of the goods Defendant sells. Such goods include, but are not limited to, Canon gray goods. Miano explained that the F&E Model therefore showed no "thoughtful and detailed analysis" by Defendants, and no effort to determine whether every expense listed was attributable to Canon gray goods and how any proration was calculated. Tr. 24:25-25:7. Miano testified that she tried, but was unable to make some sort of correlation between expenses versus sales of Canon gray goods. Tr. 9:4-17.

Her efforts revealed no such correlations, but instead led to questions regarding the overall reliability of the conclusions in the F&E Model. Tr. 9:10-12.

Despite her difficulties, Miano was able to use the documents that were provided to properly identify certain specific expense items with a direct nexus to Canon gray sales. She therefore excluded those expenses from gross profits to arrive at Defendants' net profits. The four categories of expenses considered by Miano are: (1) costs of product; (2) bank credit card charges; (3) sales commissions and (4) costs of shipping. Tr. 9:22-10:1. Miano noted that Defendants' sales of Canon gray goods represented a relatively minor percentage of their entire business - approximately 4-10% thereof. Tr. 10:4-7. In view of this small percentage, Miano declined to apply an across the board percentage expense allocation. Instead, she tried to consider whether, if Canon gray sales ceased, Defendants' business would change. For example, she considered whether in response to such an eventuality Defendants would close a distribution facility or fire employees. Tr. 10:8-14. Because she was not given sufficient information to make such calculations, Miano adhered to her decision to consider only the four categories of expenses identified above when considering whether Defendants earned profits on the sale of Canon gray goods. Tr. 10:18-21.

In addition to testifying as to her methods, Miano testified as to her understanding of Defendants' expert's attack on her conclusions. That attack, as discussed further below, references an accounting method known as the "full absorption" method. Tr. 10:24-25. Miano stated that this method employs a line by line analysis of all expenses to identify whether they are directly related to the sale of a particular good. Tr. 11:2-8. Expenses that would be considered in such a calculation might include, for example, rent. An accounting expert applying a full absorption method would determine how to properly allocate rent as an expense associated

with the sale of Canon gray goods. Tr. 11:15-17. Miano stated that Defendants' failure to supply her with full accounting records made it impossible for her to use the full absorption method in this case. Tr. 11:9-10.

On cross-examination Defense counsel explored Miano's decision not to apply the full absorption method. Tr. 13:13-14:4. Miano elaborated on her position expressed on direct examination. She referred to the full absorption method as a specific cost accounting term that considers every expense item, whether overhead, direct or variable. Tr. 14:5-9. She stated again her inability to apply such an approach because of the failure of Defendants to supply her with sufficient relevant data. Tr. 14:10-24. She stated that if she had been applied with full accounting records she would have been able to do a "more granular" analysis of fixed and variable costs. Tr. 14:19-24; see also Tr. 16:22-17:11 (referring to failure of Defendants to supply her with sufficient accounting records that would allow her to properly analyze line by line expenses). Miano used the expenses of rent and payroll to help demonstrate her inability to apply full absorption. She noted that while these expenses were fluctuating costs that spiked up and down, there was no logical correlation between these expenses and the sale of Canon gray goods. Tr. 20:19-22:16. Thus, it would be difficult if not impossible to properly attribute such expenses when calculating profits from the sale of Canon gray goods.

Miano was asked about her characterization of the amount of Canon gray goods sold by Defendants as de minimus when compared to all of Defendants' sales. She agreed with Defense counsel that the sale of Canon gray goods represented an average of approximately 7% of Defendants' sales. Tr. 25:13-26:10-21. Miano stated that such sales were considered by her to be de minimus in the larger context of questions relating to what Defendants' business would look like if such sales ceased in their entirety. Consistent with her direct examination, Miano stated

that she considered whether, in such eventuality, Defendants would move or close a warehouse. She concluded that they would not. Tr. 26:22-27:15. Miano was asked to consider that Defendants' sales of all goods during relevant time period ranged from $12-31 million. She was then asked to explain why payroll, rent and insurance (expenses for which Miano did not account in reaching her profit calculation) were not associated expenses with respect to 7% of these sales. Tr. 27:22; 29:6-8, 11-13, 15-17; 30:2-3, 5-6. Similar to her other testimony, Miano responded that she was unable to make such an allocation because she was not supplied with sufficient data. Tr. 28:17-21.  Miano further stated that in the absence of such data she simply did not include such expenses, but instead assigned zero as the amount of any such expenses when considering Defendants' profits. Tr. 31:9-11. As to use of the full absorption method, Miano reiterated on cross-examination her position stated on direct, i.e., that she was never provided sufficient data to apply this method. Tr. 32:19-24.

      B.      Defendants' Expert: Elliot Fishman

Elliot Fishman was retained by Defendants to rebut the testimony of Miano. Tr. 38:4-5. His expert report (the "Fishman Report") appears as DE [139-33].  Fishman has a Ph.D. from the University of Pennsylvania in economics with a focus in the area of intellectual property. He also has an MBA from the Wharton School and has taken online courses in marketing and finance. Tr. 45:3-9. Fishman has worked as an investment manager at a venture capital fund where he invested in companies like the Defendant companies here. Tr. 45:10-24. Additionally, Fishman has worked as a college professor at the Stern School of Business of New York University and the Stevens Institute of Technology. Tr. 46:3-13.  Like Miano, Fishman has published and presented extensively. See DE [139-33] at 38-40.

Fishman opined that Miano applied a flawed methodology to reach her conclusions regarding Defendants' profits from the sale of Canon gray goods. In essence, Fishman states that Miano failed to deduct the proper expenses in reaching her conclusions. While Fishman agrees that Miano accounted for some expenses, he made the decision to deduct additional categories of expenses. Those additional expense categories are: payroll, business travel and auto, computers, employee benefits, insurance, professional fees, rent, repairs, utilities, security deposits, trade shows and depreciation. According to Fishman, when such expenses are properly included, it becomes clear that Defendants earned no profits from their sale of Canon gray goods during the Damages Period. Instead, while profits were earned in certain years, sales over time resulted in losses. See generally DE [139-33]. Specifically, Fishman states that the sale of Canon gray goods resulted in a net loss to Defendants of approximately $1.08 million during the Damages Period. See Tr. 39; DE [139-33] at 23.

Fishman testified that he understood Miano to use a method called "incremental profit" as opposed to the full absorption method. Tr. 39:15-19.  According to Fishman, the full absorption method is the only appropriate method to use to measure profits here. Tr. 39:17-19. Fishman's testimony shows that the parties agree in general, as to the percentage of Defendants' overall sales during the Damages Period that is attributable to the sale of Canon gray goods. Thus, Miano set such sales at approximately 7%; Fishman stated they were between 5% and 10% of Defendants' sales. Fishman testified that in his experience, and in the absence of very sophisticated cost accounting systems, it is well understood that one applies a pro rata allocation to determine expenses. Tr. 41:6-10. Fishman said that Miano used the same methodology of pro rata allocation, but did not include all of the expenses that, in his view, should have been included. Tr. 42:7-10.

When asked to testify as to documents he consulted in reaching his opinion, Fishman stated that he read all depositions, the pleadings, discovery rulings, emails between the parties and, the discovery file in general. He also stated that he consulted reference texts, AICPA guides referred to in Miano's report, as well as his own library. Tr. 43:18-44:3. He referred to his expertise as a board member of a company with a remarkably similar business operation and cost structure to those of Defendants, i.e., an online retailer with a warehouse and business-to-business shipping. Tr. 44:5-9. Fishman drew a similarity between the warehouse used by this company and that used by Defendants here. Tr. 44:6-8. He referred to a warehouse visit which was made in connection with a different lawsuit (one commenced by another company seeking lost profits from the sale of gray market goods). It is clear to the Court that this visit was made by Fishman in connection with his engagement to serve as an expert witness in the case of Fujifilm N. Am. Corp. v. Big Value, Inc. et al., No. 16-5677, 2018 WL 4210132 (E.D.N.Y. 2018) (BMC) (hereinafter "FujiFilm"). There, Fishman was precluded from testifying because he relied on a spreadsheet provided to him by Defendants, and was never provided with any underlying data. The failure to provide underlying data led the District Court in FujiFilm to preclude Fishman's testimony as a Rule 37 discovery sanction. See id.

Fishman was cross-examined extensively about the F&E Model. He agreed that this document was prepared by Mr. Raphaeli, who reports to CEO Gedalia Waxler. Tr. 48:23-25. Consistent with his direct testimony, Fishman agreed that he and Miano both accounted for expenses associated with the sale of gray goods when determining profits (or losses). As he noted, Miano deducted only the limited expense categories set forth in her report; Fishman deducted expenses for sixteen separate categories. Tr. 49:8-14. Fishman agreed that the F&E Model is Defendants' demonstration of their profits or losses from the sale of gray goods in this

case. Tr. 50:17-23.  He also agreed that the F&E Model consists of information derived from Defendant's financial statements, and that the costs of goods sold was derived from their inventory management system. Tr. 51:6-9. He was not sure if Raphaeli chose to include every expense category in the F&E Model, but concluded that it properly deducted a pro rata percentage of every single expense of Defendants' enterprise from gross sales (with one caveat regarding the double counting of certain shipping costs) to calculate profits in this case. Tr. 51:13-52:2.

Fishman neither used the words "full absorption" in the Fishman Report nor at his deposition. Tr. 52:10-15.  Despite never previously using this term, Fishman testified at the hearing that the F&E Model was an appropriate reflection of the use of this method. Tr. 54:22-25. He was asked about characterizing some expenses in the F&E Model as "SG&A" (an acronym for "selling, general and administrative") expenses, rather than reporting such expenses separately. Such expenses are "operating" expenses or "cost of doing business" expenses. Tr. 53:15-24. When writing the F&E Model, Raphaeli broke out each SG&A expense into separate categories. Fishman was asked if such a breakdown is consistent with best accounting practice. Tr. 53:15-17. He replied that breaking out expenses in this way was professional and showed good work and diligence by Raphaeli. Tr. 53:18-24.

Fishman was asked to provide the factual connection between each category of expenses and the sale of Canon gray goods. Tr. 55:1-3. He stated that during his one hour site visit (which was held in connection with the Fujifilm case) he observed Defendants' operation where all staff were taking, fulfilling and shipping orders across different brands and merchandise. Tr. 55:4-21. He concluded that costs associated at the parent level were shared among all lines of business that generate revenue. Tr. 55:8-10. Fishman was asked what other information he relied upon

when he concluded that the F&E Model sufficiently connected each of the sixteen categories of expenses therein to the sale of Canon gray goods. Tr. 56:5-6. In response, Fishman referred to the deposition of the customer service manager regarding her duties. Tr. 56:19-20.

After much cross-examination, Fishman finally agreed with the basic notion that revenues less associated costs leads to a determination of profits. Tr. 56-59:22. He ultimately agreed that it was fair to say that revenues less costs is the appropriate methodology for determining profits. Tr. 59:22. As referred to above, Fishman parted ways with Miano in determining which costs to properly deduct to determine profits. Tr. 59:25-60:1. According to Fishman, Miano did not include enough expense categories in her profits determination. Tr. 59:25-60:1.

The Fishman Report characterizes Defendants' business as a service business because they take and fulfill orders. Tr. 61:18-20. At the hearing, Fishman testified that with respect to such businesses certain general and administrative expenses should scale linearly with sales. Tr. 61:20-21; 66:7-12. He states that it was therefore appropriate for Defendants to deduct for fixed costs on a pro rata basis. Tr. 61:24-62:3. Fishman stated that because Defendants operate a service business it is appropriate to deduct both direct and indirect costs. Tr. 62:7-10.  This characterization of Defendants' business was based upon Fishman's plant tour in the Fujifilm case, review of the discovery file herein as well as his experience in this industry. Tr. 63:12-15. Characterization of Defendants' business as a service business allowed for the deduction of all SG&A expenses when determining profits. Tr. 64:12-15. Fishman stated similarly in his expert report that all expenses, whether direct, indirect, fixed or variable should be taken into account on pro rata basis when calculating any profits (or lack thereof) from the sale of Canon gray goods. See DE [139-33] at 21.

12

As to his testimony reflecting costs scaling linearly in every expense category in the F&E Model, Fishman testified that if, for example, Defendants sell ten percent more merchandise they would incur ten percent more in the costs of, for example, shipping bays, lift trucks and packaging materials. Tr. 64:14-18. Needless to say, this is in direct opposition to Miano's opinion. Fishman's report rejects an accounting method similar to that applied by Miano which he described as "more sophisticated cost accounting analytics". Fishman testified that such an elegant accounting method would cost millions of dollars of investment in accounting technology, and it would be unrealistic for a business like Defendants to use any such system. DE [139-33] at 20.

Fishman also testified about a telephone conversation with Yiddy Werzberger and Gedalia Waxler on March 3, 2022, which was four days before the F&E Model was finalized. Tr. 56:24-57:4. Fishman was cross-examined extensively about this March 2022 conversation, which he described as lasting between 30 and 40 minutes. Tr. 66:13-67:2. During that conversation, Fishman confirmed certain assumptions that he made regarding each expense category. Tr. 68:21-22. Fishman testified that the conversation was held in order to wrap things up with Defendants, and that information he received during that call was not critical to the formation of his opinion. Tr. 92:9-19. He further stated that nothing he learned during that call changed his opinion. Tr .110:5-6. Fishman's notes taken during that conversation were entered in evidence at the hearing as Exhibit 13. Tr. 67:9-14. Fishman annotated each category or expense in the F&E Model with either an "F" for fixed cost or a "V" for a variable cost. Tr. 69:4-11. During his March 2022 conversation Fishman changed the category of certain expenses. When explaining different assumptions he made regarding such costs, Fishman referred to "step" functions. Such "step accounting" states that in certain large data sets there is a "smoothing" of

data over time such that large increases or decreases in fixed costs (the "steps" referred to) eventually become linear with sales. Therefore, even fixed costs are properly prorated over time. When asked if there exists a threshold for the size of a data set required before concluding that a cost becomes "smoothed" to scale linearly, Fishman responded that only a mathematician could answer the question. Tr. 70:5. Similarly, when he was asked if there is a minimum number of step functions that must occur before smoothing occurs, Fishman stated that he could "draw those curves here if we want to be here all night and pull up some software to do that . . . ." Tr. 70:8-9. When pressed, Fishman answered only that the answer would be "case dependent." Tr. 70:13. When asked if he conducted any analysis in this case to determine whether there were sufficient step functions such that the defenses' expense categories would smooth out over time, Fishman responded that he had not. Thus, with respect to the use of step functions, Fishman was able only to refer to this economic theory; he was not able to apply it the facts of this case. Tr. 74:24-75:6; 79:3-7; 81:1-5.

As to the losses alleged to have been suffered with respect to the sale of Canon gray goods, Fishman recognized Defendants' position that they carried such products as "loss leaders." Such products are sold not to reap profits, but to drive internet traffic to Defendants' websites. DE [88]; DE [139-33] at 22. Fishman agreed that it made sense to carry Canon goods for this reason. Tr. 89:11-12. In addition to explaining Defendants' decision to continue to carry unprofitable Canon gray goods as "loss leaders" to drive internet traffic, Fishman explained Defendants' decision to endure such losses as evidence of sales taking place in an economic environment of "perfect competition". DE [139-33] at 24; DE [99]. In such an environment seller returns are minimal because of an efficient market. This market is characterized by the presence of multiple buyers and sellers offering or buying the same product at the same time, creating a

perfect balance of supply and demand in an environment where all have the same information. Tr. 100:5-18. All such buyers also act rationally, and there are no outside influences such as governmental regulation. DE [139-33] at 26-27.

In partial support of his claim that all buyers have the same information Fishman referred to internet searches conducted by Frank, Tr. 102:22-24, whose testimony has been recommended to be excluded herein. See DE [142]. In any event, Fishman explained that when all of the factors that comprise a perfect market are present there is perfect competition and a seller's profits are miniscule, if they exist at all.  This, according to Fishman, explains Defendants' losses in this case - they are consistent with a perfect market. When asked whether Defendants do business in a perfectly competitive market, Fishman testified that they absolutely do not. Tr. 103:15. Like his testimony explaining step function accounting, Fishman was able to discuss a general theory, but conducted no analysis to connect it to the market in which Defendants do business. Tr. 106:11-25. Thus, like his testimony relying on step functions explaining smoothing of expenses over time, Fishman was unable to meaningfully apply the theory of perfect competition to the facts here. To the contrary, when pressed to connect this theory to his loss leader testimony, Fishman acknowledged that the concept of a loss leader does not fit within a theory of perfect competition. Tr. 106:2-5.

<u>DISCUSSION</u>

I.     <u>Legal Standards: Rule 702 of the Federal Rules of Evidence and *Daubert*</u>

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the testimony offered is competent, relevant, and reliable. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93, 592 n.10 (1993). To determine admissibility, a Court must examine: (1) the proposed expert's qualifications; (2) whether the proposed testimony is relevant, that is, whether it would be helpful to the factfinder and (3) whether the proposed testimony is based on reliable data and methodologies. Id. Decisions as to admissibility are within the broad discretion of the District Court. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); United States v. Shipp, 422 F. Supp. 3d 762, 768 (E.D.N.Y. 2019). When applying its discretion the Court must keep in mind that the standard for admissibility of expert testimony is "especially broad". Nonetheless, "expert testimony should be excluded if it is speculative or conjectural." FUJIFILM, 2018 WL 4210132, at *5 (E.D.N.Y. Sept. 4, 2018). It is important to note that the relevant inquiry is not a question of weight, but of admissibility. See Hollman v. Taser Intern., Inc., 928 F. Supp. 2d 657, 667 (E.D.N.Y. 2013). It is equally important to recognize the "gatekeeping" function assigned to District Courts under Rule 702. Thus, Rule 702 and Daubert charge trial courts with the "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597.

II.    Disposition of the Motions: Application of *Daubert* Standards

A.    Qualifications of the Experts

When determining whether a witness qualifies as an expert, "courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." Focus Prods. Grp. Internat'l., LLC v. Katri Sales Co., 2022 WL 17851810, at * 52 (S.D.N.Y. Dec. 22, 2022) (quoting United States v. Tin Yat Chin, 371 F.3d

31, 40 (2d Cir. 2004)). The Court need not pause long to discuss the qualifications of the parties'

damages experts. Both Miano and Fishman are well-qualified to render expert opinions

regarding the accounting of profits. Indeed, neither party attacks the others' experts'

qualifications to testify, in general. Thus, the Court holds that both Miano and Fishman are

experts within the fields of accounting. However, meeting this qualification prong does not

necessarily mean that the testimony proffered is admissible at trial. Accordingly, the Court turns

to discuss the remaining Daubert standards.

        B.      Relevance and Helpfulness of the Proffered Opinions

        The second Daubert inquiry - whether the testimony offered is relevant and helpful to the

fact finder - requires the court to: (1) identify the legal issue the witness testimony addresses and

(2) determine whether the proffered testimony "fits" the facts of the case. Here, the legal issue as

to which the experts seek to testify is that of damages. All agree that such damages are profits

lost by the Plaintiff, which are measured by Defendants' profits on the sale of Canon gray goods.

All similarly agree with the broad notion that net profits are equal to gross profits minus

expenses. This calculation requires a determination of whether deductions of expenses from net

profits are properly considered. A defendant found liable seeks to maximize expense deductions

to show that they gained little or no profit from their activities; a plaintiff seeks to minimize such

deductions to show that defendant did indeed profit. This describes the circumstances here.

        According to Defendants, the only proper way to arrive at a damages calculation is by use

of the full absorption method of accounting. They fault Miano for using what they refer to as an

incremental cost accounting method. The full absorption method of accounting, as applied by

Fishman in this case, deducts a proportionate share of broad categories of expenses to arrive at a

profit calculation. An expert applying the incremental approach will not deduct expenses that

would have been incurred with or without sales of gray goods. An expert using the incremental approach argues that it makes no sense to deduct expenses that would exist even if gray goods were not sold. Thus, for example, Miano testified that Defendants would neither fire employees nor close warehouses if Canon gray goods were not sold. Defendants argue that Miano's approach does not fit the facts of this case as required by Daubert. Plaintiffs argue that Fishman's approach fails the Daubert fit test.

Defendants' position hinges on the argument that use of the full absorption method is required in this Circuit. Plaintiff argues that the law is more nuanced, and that the accounting method used depends on the facts of the case. Plaintiff is correct in their argument that Defendants overstate the law to require only a single accounting approach in all cases. As stated by the court in Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558 (S.D.N.Y. 2007) courts are to use the full absorption method, "but only if the defendant proves the connection between a general expense and the sales" at issue. Dooney & Bourke, 525 F. Supp. 2d at 656; see also Bruce Kirby, Inc. v. Laserperformance (Europe) Ltd., 2021 WL 328632, at * 14 (D. Conn. Feb. 1, 2021). As in Dooney & Bourke, Defendants here will bear the trial burden of showing a "nexus between each expense claimed and the sales" at issue. 525 F. Supp. 2d at 656.

For purposes of its Daubert analysis the Court holds that both the full absorption and the incremental accounting methods generally fit the facts of this case. This second prong of Daubert presents no admissibility barrier to either party's expert testimony with respect to their references to either full absorption or an incremental approach to determining profits. Defendants may launch a trial attack on Miano's decision not to apply full absorption, and she may testify that she could not use this method because there was insufficient information to use that method. Plaintiff may attack Fishman's decision to include certain categories of expenses, and Defendants will

bear the burden of proving a sufficient nexus between any expenses rejected by Miano (and relied upon by Fishman) and the sale of gray goods. Miano's trial opinion can be expressed conditionally, i.e., assuming that Fishman cannot connect any of the expenses that Miano refused to deduct, then the amount of net profits from the sale of gray goods is that expressed in her opinion, i.e., in excess of $4 million. Also at trial, the jury may consider whether Defendants provided sufficient evidence to allow Miano to make the proper determination, and apply whatever weight they deem proper to testimony that her efforts were hampered by Defendants' failure to provide sufficient information. These are all matters that may be explored at trial. However, for purposes of this in limine recommendation, this Court holds that both methods used by the parties' damages experts meet the second prong of Daubert.

    C.    Reliability of the Proffered Opinions

    As to the third and final Daubert inquiry - reliability- the Court considers whether the proffered testimony is "grounded in sufficient facts or data," is "the product of reliable principles and methods," and whether the witness "has applied the principles and methods reliably to the facts of the case." FUJIFILM North Am. Corp. v. Big Value Inc., 2018 WL 4210132, at *4-5 (E.D.N.Y. Sept. 4, 2018), citing, Wills v. Amerada Hess Corp., 379 F.3d 32, 48 (2d Cir. 2004) (internal quotation marks omitted) (quoting Fed. R. Evid. 702). This prong of Daubert requires the Court to consider whether the expert shows a sufficiently reliable connection between the methodology used and the experts' conclusions. Hollman, 928 F. Supp. 2d at 668; Fuentes v. Scag Power Equip., 2019 WL 3804735, at *5 (E.D.N.Y. Aug. 13, 2019). An expert's method may be proper, but if that method relies on assumptions that lack a proper evidentiary foundation the opinion may be excluded under Daubert. With respect to this Daubert prong, "a court may conclude that there is simply too great an analytical gap between the data and the opinion

proffered." Hollman, 928 F. Supp. 2d at 668 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). If this is the case, the expert opinion fails the final prong of Daubert and the testimony is therefore inadmissible.

Miano's testimony passes this final test. The categories of expenses that she deducts to arrive at her profit calculation are well grounded in the facts provided. While Defendants may argue that Miano did not deduct enough expenses, there is no question but that the data provided during discovery supports the particular deductions that Miano made from Defendants' sales. Miano should be allowed to testify, without limitation, regarding Canon's damages.

Fishman's opinion passes muster in certain aspects, but not all. As an initial matter, the Court holds that there is sufficient data upon which Fishman can testify regarding his decision to apply a pro rata analysis to expenses incurred in connection with the sale of Canon gray goods. While it is Plaintiff's burden to prove damages, Defendants bear the burden of justifying the propriety of each expense deducted by Fishman. Plaintiff will certainly cross-examine Fishman on this issue (as somewhat previewed at the hearing) but Fishman should not be precluded from testifying as to expenses he chose to deduct.

While Fishman may testify as to his pro rata allocation of expenses pursuant to application of the full absorption method, there are two aspects of Fishman's proffered testimony that should not be allowed to be presented to the jury. Specifically, the District Court should not allow Fishman to testify about step function accounting, or the theory of perfect competition. While the Court recognizes that such theories are grounded in the study of economics, Fishman could link neither theory to the facts of this case. As discussed above, Fishman never undertook to apply either theory here. Indeed, as to perfect competition, he testified specifically that Defendants do not operate in such a business environment. It would be unhelpful and confusing

to the jury to allow Fishman to rely on these theories to support his opinions at trial. It is therefore recommended that Fishman be allowed to testify as an expert and to refer to his application of the full absorption method to determine profits, but his testimony should be limited to exclude any references to or reliance on step accounting and the theory of perfect competition.

III.    <u>Recommendation as to Sealed Documents Upon Final Disposition of the Motions</u>

All motions <u>in limine</u> are filed partially under seal in order to protect sensitive business information. <u>See</u> DE [140] and Order of the District Court dated September 27, 2022. Thus, on the docket herein are both sealed and unsealed versions of the motions. Canon has also requested partial sealing of their post-<u>Daubert</u> hearing submission, and this Court has granted that motion. <u>See</u> DE [149]. The Court notes however, that it has considered in its disposition of the referred motions all submissions, both sealed and unsealed. It is therefore recommended that after final disposition of the motions <u>in limine</u> by the District Court that the entire docket in this matter be unsealed.

## CONCLUSION

For the foregoing reasons it is respectfully recommended that the motion to exclude the testimony of Susan Miano, appearing as Docket Entries 138 (unsealed version), 139 (sealed version) be denied in its entirety. It is further recommended that the motion to exclude the testimony of Elliot Fishman, appearing as Docket Entry 133 (unsealed version), 134 (sealed version) be granted in part and denied in part.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel. Any written objections to the Report and Recommendation must be filed with the Clerk of the

Court within fourteen (14) days of service of this report.  28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals.  Thomas v. Arn, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.").

**SO ORDERED.**

Dated:  Central Islip, New York
         July 28, 2023

                                         /s/ Anne Y. Shields
                                        ANNE Y. SHIELDS
                                        United States Magistrate Judge